Mr. Hogue, are you ready to proceed? I am, Your Honor. Okay, well, I'd like to ask Jen to stop the clock because we have a couple of preliminary matters we wanted to raise with you all, so I don't want this time to count against your time. And I guess the questions that I think the panel has are about whether or not we have a final judgment. So I think both counsel should probably listen carefully. Mr. Harvard, that goes for you as well, and we may ask for your response. So the question we have as a preliminary matter is whether or not we have a final judgment. And that question is raised with respect to the 757 patent specifically, as there were counterclaims of invalidity, as we understand the record, and the court just reached the question of infringement. And at least as far as we can ascertain in the record, those counterclaims of invalidity for the 757 were neither dismissed without prejudice, no 54B, etc. The second piece of that, before I ask for your response, is that the complaint here talked about extended to all claims, not just the asserted claims. And there were counterclaims, I guess, so there was nothing the court just dealt with the asserted claims. So are those all claims other than the asserted claims out of this case gone, or do we need some closure for those as well? Now let me ask my colleagues if they have anything to add to this question before we ask you to respond. No, I agree that the 757 is the one in which we don't have an invalidity judgment. We have only a non-infringement judgment, but that leaves the question of, even as to the other two, that the counterclaims refer to all claims being invalid. And the one thing I guess I would add is that they say that they're all invalid, not just under 101, but also 102, 103, and 112, I think. So there seems to be this unresolved set of counterclaims on its face in the case. This is Judge Rana, and also I'd like for counsel to just address briefly the issue of mootness here. Our carnal chemical company, this court held that a finding of non-infringement does not by itself meet a request for declaratory judgment on invalidity. And so it seems to me that there's a potential here for these claims to be alive. There's no finality, unless the parties are able to show us otherwise this morning. Okay, so let's ask Mr. Hogue and then Mr. Harber if they could respond to the concerns the panel has raised about finality. Well, this is Mark Hogue. I have to say I'm surprised, and I guess I would need to go back and take a look at the documents you're talking about. I do know that Judge Gilliam rendered judgment for Dropbox in that end of the case. I never considered that their declaratory judgment counterclaim was live after that point. That's all I can say at this point. Well, I think we do have case law. I'll just respond to that. This is not the first time this issue has come up before the court, and so I do think in our cases we've made clear that counterclaims need to be disposed of in some way, either dismissal without prejudice or 54B. I presume you're not familiar with those cases. Well, I'm just having a problem recalling whether or not there is a declaratory judgment counterclaim. That's kind of where I'm at. This was several years ago. Maybe Mr. Harber can tell us, because presumably the counterclaim was his. My recollection is that the 101 was originally – forgive me if I'm confusing cases – but in this case, the 101 was originally by way of a motion to dismiss before there was even an answer. Of course, there were no counterclaims then, and the district court said, I will deny the motion to dismiss. Later, in I think first an answer and then an amended answer to the amended complaint or the second amended complaint, there then comes to be from Dropbox not only affirmative defenses but counterclaims, I think four, five, and six, which assert invalidity of the three patents that are at issue, and that, at least in my mind, is what seems to be hanging out there without there having been a ruling on them. But maybe Dropbox, whose claims these are, I guess, can address this. Okay, we'll turn to you, Mr. Harber. Thank you, Chief Judge Prost. This is Adam Harber for Dropbox. Judge Toronto is correct that Dropbox did have invalidity counterclaims in the case. I suppose, like Mr. Hogue, we never considered the matter not final, and the court, I believe, closed the case. And so I think for purposes of this appeal, we consider there to be a final judgment on those issues. And obviously the court, our cross-appeal deals with the 101 motion to dismiss, which we think fully addressed that issue as to the claims. Well, I appreciate your comment that what you consider to be a final judgment, the question is what is the reality? We have to consider the record. So are you prepared to make a statement or do anything with respect to these outstanding counterclaims? Well, Your Honor, I appreciate that. I think if the issue is whether or not there is currently a final judgment on whether we're saying we consider those to be closed and dropped, I think we are willing to make that representation. Okay. Colleagues, please proceed. Yes, Judge Reyna. Yeah, this is Judge Reyna. I want to make sure that I heard counsel correctly. And what you're saying, Dropbox is saying that you're no longer going to pursue counterclaims because it's on the basis that your understanding, or at least the way you saw the case, is that the court did dismiss with finality the counterclaims in validity. Is that correct? That's correct, Judge Reyna. Okay. So you dropped the counterclaims this morning if, in fact, it was still an initial finality. You're telling us Dropbox drops the counterclaims? Yes, that's correct. I'm sorry. Maybe I shouldn't be confused. So that means your cross-appeal is something we can ignore because you've just dropped your 101 counterclaim? I'm familiar with Cardinal Chemical, Your Honor, and what that case stands for. What I'm not sure has applied to this case is that requires there to be a counterclaim in order for the invalidity issue to be separate. I think, as Your Honors have pointed out, the issue here would be on the 757 patent, which is where the district court's judgment was one of non-infringement, whereas the other two patents, the judgment was invalidity, which I think would move the issue. I think, in our view, the cross-appeal on 101 for the 757 patent, if the court were to rule in Dropbox's favor that the claims were invalid on 101, I think that would have the effect of mooting the non-infringement issue, frankly. What about the other way around? I think if it's the other way around, again, without being able to separately address the legal issue and possibly submit supplemental briefing, I can't commit to how those cases play out. If Cardinal Chemical and the Supreme Court's or this court's judgments require there to be a live counterclaim in order to rule on invalidity, then, per my earlier representation, we've dropped those counterclaims for purposes of presenting a final appeal, and so the court need not rule on that. Maybe I can just ask the question this way. You can drop your counterclaims and yet retain the 101 affirmative defense to the infringement charge under 757, and that would mean that if we affirm non-infringement, that is, reject Synchronous' appeal, then the 101 now affirmative defense would, in fact, be moot. Yes, Your Honor. Okay. Well, I'm not sure how to proceed, so I'm looking to my colleagues if they have any other view. It seems to me that perhaps we are in need of a short recess so that the panel can, which I'm sorry to tell you, Jennifer, that's what I wanted to catch you on before, the need for a short recess at this point. Can you tell us how you would be able to finesse that or finagle that, given the audio system and where we are? I believe I can disconnect the panel members from the call while the attorneys remain on the line, and then I can connect you back in after. I can set up a conference with just the panel members. Okay. So you would proceed to disconnect the judges from this call, and then you will call us on another line so that we can converse just amongst ourselves in the interim? Yes. Is that what I understood? Okay. My colleagues amenable towards proceeding in that regard? Yes. Yes, that's fine. Okay. And do the parties understand that I guess you remain on this call, and we'll get back to you promptly, we hope? Yes, Your Honor. Yes, Your Honor. Appeal number 2019-2196, synchronous technologies versus Dropbox. This is a continuation of the discussion we had earlier today about the final judgment questions, and the panel has conferred, and now we're back on the record. Counsel, and I want my colleagues, if I've misunderstood or misstated anything, to please feel free to jump in. But the panel has concluded that based on Mr. Harber's representation, that Dropbox is now today dropping or withdrawing all of the counterclaims and only pursuing the 101 claim as an affirmative defense with regard to the 757 patent. We are ready to proceed with the merits case. Do counsel concur if I've stated correctly what the positions are and what we are? Mr. Hogue? Yes, Your Honor. Do you concur? I do concur to the extent I have a say in the matter. Yes. Mr. Harber, do you have any objections, or are you concurring and proceeding in the manner I've described? I have no objection, Your Honor, and concur. Thank you. Okay. Thank you. So we're now ready to proceed with the merits case. Mr. Hogue, start you again. Thank you. Good morning again, and may it please the Court. I'd like to spend some time on the importation of hardware into the 757 and the 446 patents. That limitation is not expressed in the claims. It wasn't added by argument during prosecution. It's not mandated by the inventor's definition of device or system in the specification. Where as close as it gets is software residing on hardware. It is actually contrary to the specification. And the importation of client-side hardware is even much more of a random importation. The 446 patent, Step C in Claim 1 or A in Claim 11, is not indefinite. Those claims do not say that a media file contains a directory. The clause in question comprising a second version of the media data in the same format as the first version in the personal information space, that is grammatically correct. There's nothing ambiguous in that term whatsoever. These claims have been litigated, gone through inter-parties, re-examined, they're licensed. No one interprets it the way that the Dropbox suggests and the court suggests. And in fact, Dropbox's expert, Friedman, had no problem understanding and defending against it. This is Judge Sorrento. Can I ask you a question about that directory point? And just to confirm something I don't really have much doubt about. One possible meaning of the term directory is, let's just call it table of contents or index. But I gather that it has been agreed all along here that the directory here is essentially the complete collection of all of the content that would be listed in it, not just the listing. So not a three-page table of contents, but a 500-page book. And that's what causes the difficulty of having a particular file that's in the directory also contain the entire directory. Am I right about that? I don't know that that's what is causing the difficulty here. I have never had a difficulty. But I think that your understanding works. Then on the 696 patent, the district judge ruled that six limitations were under paragraph six and that none of the limitations had statutory means plus functional language. Four of the six limitations contained the term module. And in accordance with a case named Williamson, he declared they were nonce terms and then they were paragraph six. But in our patent, the term module is a software term. You have to identify modules and so forth in the middleware aspect of the patent. The other two limitations didn't have any nonce words in them. They weren't in means plus function format. And he just said that it was means plus function anyway. But notwithstanding that, we did show that there was substantial structure, algorithms, source code on pages 53 to 55 of our brief. And as another point, you're supposed to interpret claims in terms of indefiniteness from the level of ordinary skill. He never made that finding. And that's basically the points in our brief, Your Honor. Can I just clarify one thing? This, I guess, is on the 696 indefiniteness based on 112-6 or 112-F. There's a list of six separate terms. My understanding, and just tell me if this is right, that each of two terms appears in all of the claims, namely user identifier module and transaction identifier module. And if the district court was correct about either one of those two, the rest would not need to be addressed. You are taxing my ability at this point, Your Honor. I'm going to have to double check that with my chart, if I may. Look at the markman. It was a little difficult because of all of the certificates of correction to arrive at the final language of the claims. The patent office printed the originally filed claims, and it was a nightmare getting that correct because of the substantial. Well, anyway. I'm having trouble locating my chart. That's okay. Don't take your time on that. Okay. I'll reserve time, if I may, and pass the argument on to my colleague. Okay. Mr. Harber, you're up. Please proceed. Thank you, Chief Judge Crowes. And may it please the court, Your Honor, the district court here found that all of the claims that were asserted in the three-patent suit were either invalid or not infringed based on the textbook application of clear binding authority from this court and the clear factual record below. And those decisions should be affirmed. I want to start with the infringement issue on the 757 patent. And Mr. Hogan, his argument just now, called it a random importation of hardware into the claims, including on the client side. And as Your Honors know, and as we said at our brief, there was not a random importation of hardware. That is the clear implication of the specification and the intrinsic record here. And it also flows directly from what Mr. Hogue himself told the district court during the Markman proceeding, this case. In other words, the entire dispute between the parties on the term system and device resolved around the question, revolved around the question of, could those terms be interpreted to cover software without any hardware? And when that issue was raised at the hearing, the court said it doesn't sound like there's any issue on that. And Mr. Hogue agreed that there wasn't, that in fact, even under their claim construction, hardware was required on the client side because that's where the systems and devices are in the claim terms. And that no one was arguing that the claims could be infringed by software alone. Not withstanding that clear record at the district court, what Synchronos is now trying to argue is that in fact, the claims can be infringed by software alone. And there is no case that they cite in their brief or no precedent of this court that allows such a holding the under Centillion, which is on all fours with this case, the, the accused infringer must make use or sell the entire claimed system in order to infringe a system claim. And in that case, the question was if the users installed the software that was provided by quest on their local processing means, which was, was their computer. What, what, even though it was quest software and they controlled it. And in that case of what's until he had argued is that they were the mastermind of the system. Was that making the system in the court held very clearly that it was not. And that ruling applies whether or not hardware is required or whether the software must simply reside on hardware. The key point is the software has to reside on the hardware on not just one client device, but two different client devices that are joined to a central data store in order to exist. And there is no evidence and no argument in this case that Dropbox ever directly infringes a claim to those systems. It doesn't make that complete system. It doesn't use that complete system and it doesn't sell that complete system. So under the clear authority of this court, the district court was correct to the synchronous turns to a number of cases based on fantasy sports and it's reply brief. And I want to briefly address those because we didn't have an opportunity to, and I think in all of those cases, they stand for the unremarkable and frankly irrelevant proposition here that a claim to an apparatus or system, as opposed to a method that has software on hardware doesn't actually have to be used in order for someone to be guilty of, or liable for infringing the system. So in fantasy sports, there was a claim to a person, like a computer for playing fantasy football that had various software means. And all the court held was it doesn't matter if the user is required to actually use the means on the hardware, the computer that has those software means infringes the claim. Now synchronous argues that the computer in that case was the end users computer trying to draw some analogy to this case. And it says that in its reply brief without citing anything in fantasy sports. And that's because fantasy sports says just the opposite at page 11, 19, there was an entire paragraph analyzing the fact that it is in fact the, the server commissioner.com server, which is where the users of the system play. And therefore that is what maintains the software. It highlights the fact that, that the accused infringer there had advertised that there was no need to download software and updates onto the user's computer. So it is contrary to the position that synchronous has taken in this case, all of those cases simply stand for the proposition that for the software components that state, that state a capability, they need not be used for a complete system to be made. Not a single one of those cases stands for the proposition that someone can be an accused infringer, can be liable for direct infringement without meeting all the claim limitations. It nor does Unilock stand for that proposition. The, the, even under the, the in-residence theory is a district court called it. The, the claims still require hardware to be residing on soft, I'm sorry, software to be residing on hardware to be infringed here. That is the, was what synchronous maintained at the summary judgment hearing. It's what it's expert admitted that, that the system is not complete. And these, these admissions are on page 40 and 41 of our, our red brief. The system is not complete until the user installs the software on not one, but two different personal computers to form the complete system of three components. There is no active infringement as to that complete system. The, unless your honors have further questions on that, I'll turn to the four, four, six patent indefinite. Yes. On that question, the, I'll first say that as we noted in our brief, the, the notion that our expert was able to interpret the claim as Mr. Hogue just said, I think it is based on an unfair reading of the expert report. There was, as your honors are well aware, the expert gave an opinion that the claims are invalid as indefinite. And then as an alternative said, if they're not, and it means what Synchronos says it means, here's why it's invalid under section one or two and one or three. That doesn't mean that the expert was agreeing that the terms have the meaning that Synchronos describes to them. The, um, what, what Synchronos is asking the court to do here is exactly what the patentee in Chef America in Allen engineering in, in process control, we're asking the court to do, which is rewrite the claims to, to save their, to save them from invalidity, which this court has repeatedly held is improper. The, the one thing I will note here, um, if your honors, um, wish to hear about it is, you know, obviously we have our motion to strike on this point because in the reply brief on this issue for the first time, um, Synchronos argued that the claims were capable of being understood and could be interpreted in light of an examiner's amendment and a submission that they made to the patent office. There is a, assuming that those are not clearly waived because Synchronos did not fail to raise that issue at any point. Um, it's clearly unconvincing. There's a reason we would submit that Synchronos never raised that issue in Markman, never raised that issue in expert discovery, and never raised that issue in summary judgment. And that's because first the, the file history and the examiner's amendment does not make clear the meaning of the terms. Synchronos says that it's submission made clear that the generating a digital media file is the reason for the second version of the media data and then slice the 10 page submission it made without quoting anything. And that's because there's nothing in that submission that makes that clear. It merely in that submission, the patentee or the applicant was distinguishing two different prior art references on the basis of essentially every limitation in the claim. In fact, the, one of the term at issue here that was added, which is a digital media file is not, that term doesn't appear anywhere in that submission. The examiner's amendment, nor would it matter, Your Honor, the examiner's amendment, there is no case that says that if language comes from an examiner, in the case here, it was agreed by the patentee that that somehow immunizes the claim from invalidity. In fact, as Your Honor's know, every claim that is found invalid by court is one where an examiner approved of the language if they did not provide it and did so and provided. And as a result had a presumption of validity that this court has ever found that it, that, that that immunizes the claim somehow from the finding of indefiniteness. In this case, it is the language is clear. The to the point that Mr. Hogue suggested right now that the media data need not comprise or include a director of digital media files. That is not the position either synchronous or it's expert to blow at pages 49, 85 and 58, 51 of the appendix, both synchronous and it's expert agreed below that media data includes a directory of digital media files. And to judge Toronto's question, whether or not that's an index or just the files themselves, the claim makes no sense. Why would it, I don't think that this point has been contested, but why would it, and you're going to have to correct the image that's in my head. I have, I have this image of a bunch of different movies and in, and so each of those is a, is a media file. And, and in one of the movies, you know, there's a, there are kind of sandwich boards or something at the end that list all the other movies that are that media file would include a directory of all the media files. Um, if all the directory is, is, uh, an index or a list. So what's wrong with, with what I just said, the, the, I, I think what is wrong with that, your honors, that neither the patent suggests that that's what the term means, nor has synchronous ever suggested that. Oh, okay. Well, that's, I mean, that's why I asked, but, but that, that wouldn't mean that it would make no sense if that's what it did mean. Right. I think that, that, that the key point is both the inventor of the patent and synchronous is expert agreed that a digital media file cannot contain a directory of digital media files. There was no argument below to the district court as a matter of claim construction or when this issue was presented on summary judgment, that it may,  that directory. In fact, that the way that the term digital media file was defined by the court was as a digital audio or video content in the form of a file, such as an MPEG MP3 real audio or liquid audio file. There is no testimony or suggestion that that can include such an index or that the index would be what this digital media file means. And I think the further reason supporting that is that the in, in limitation E of claim one, it requires a transferring of a digital media file over the network containing the difference information. And the, if what we're talking about here is a digital media file that itself contains in it, some sort of directory somehow, that wouldn't be the difference information that's later transferred. So no matter how synchronous slices it, the claim just simply doesn't make any sense. And what they're asking the court to do is to rewrite it. The, if there are no further questions on that issue, I'll move briefly to the six, nine, six indefiniteness question. And I'll start judge Toronto with your question about the terms. And you are correct that the term user identifier module appears in all of the claims. The term transaction identifier module appears in all of the claims. And then the other terms appear in one of them. So, but, but respectfully on, on all of the terms, there is no basis to reverse the district court's clear holding here, which was based on uncontradicted, unrebutted expert testimony from Dropbox. The court found that these terms were not terms associated with structure, that there was no description and specification of personal borders, filming art would associate with these terms. And the court relied on Dropbox's expert synchronous. So contending that the district court ignored the view of a person of order and skill in the art had an opportunity to submit its own declaration, but it did not follow the district court's rules and have the declaration struck. Therefore the record here, and that they, by the way, don't appeal that ruling to this court. And so those, the fact findings that the district court made based on that uncontested fact record are reviewed for clear error. And they they're clearly is not clear error here with respect to those rulings and what the person of order is skill in the art, but how he or she would view the patent. The last issue that I'll touch on briefly is on our cross appeal on the one-on-one issues and your honors, the district court's ruling that the claims were not, did not claim abstract idea as we, as we set out at our brief came on the heels of then fish, but before a number of cases, which make clear that claims that are essentially identical to these claim an abstract idea and add nothing more. The claims and data engine, for example, claim tracking changes into in a spreadsheet by comparing versions and identifying what's changed, which in essence is what the seven five seven patent has claimed here. The synchronous tries to spin the to say that there's some benefit, but as we made clear in our, in our brief, the fact that the specification can identify a benefit to applying an abstract idea in the context of a computer does not mean that the claim is ineligible. So I hear that I'm in my rebuttal time. And unless I'm beyond our further questions, you already exhaustive Jen can correct me if I'm wrong, but I think I heard two buzzers. So I think you've exhausted your rebuttal time as well. Yes, that's correct. That's correct. Okay. Well, we'll, I mean, if the other side, you only get rebuttal with the other side deals with the one-on-one issue. And if they do, we'll restore you a minute or two. So thank you. Thank you. Your honor. I always love being misquoted when I'm arguing here. I did not say that ever that hardware was a limitation, nor would it make any difference if I had, because I'm not a source for claim construction, but on appendix page 6055, I explained to the judge what I was talking about software residing on a computer. We're talking about the magnetism on top of the hardest hard drive. We're talking about the pattern of on off switches, not the field effect transistors. I did agree that we weren't talking about software sitting in a box because I said, what he was talking about was a box full of printouts of source code. And that was as far as that goes, as far as the use of the system, Dropbox operates the whole system. Once it's in place in residence on software, wherever that software may be, it's not delineated in the claim for the use. They do use the whole system as shown in appendix page 6383. The user does nothing more than download the Dropbox client and then Dropbox watches it, updates it and make sure that everything stays in sync. That's in there. As far as you making and selling the software, Dropbox exists on its own server and, and it's distributed, you know, throughout their population of customers. The Centillion argument is severely hampered by the claim language here because the claims don't require, you know, processing means on the back end. Those limitations just simply aren't there. I didn't want to say that the, when it, when Dropbox has its anomalous interpretation of the 446 claims one and two for the indefinite misargument, that's really an enablement argument. There's nothing ambiguous in the terms. There's nothing, they're understandable. They're reasonably certain under the Nautilus standard. And the Nautilus standard does require interpreting claims in light of the specification and the prosecution history. They would like to strike the prosecution history because it's not helpful to them. And then as far as the 696, the application of paragraph six is, is not a fact. It is a matter of law. And whether or not the specification satisfies, has the equivalent structure supporting the means post-factual limitation, that is a matter of law. And, and that would conclude my argument. Unless anybody has any further questions. And I'm not inviting a response to the one-on-one issue, but you have time if you wish to deal with that. Oh, the one-on-one issue. Oh yeah. It's, it's a very, these are very strong patents. The issue number one, is it, is it, is it drawn to an abstract subject matter? The answer to the question is no. So the, the patents are directed to improving the speed, minimizing bandwidth, decreasing storage, and then enabling two people to sync, two systems to sync without being directly connected against each other. So, so that's an improvement in the hardware. As far as the step two goes, we have quite a bit of, we have structure. I wanted to pull that out. Anyway, we have the two sync engines that, that in a data store, the sync engines have a structure in them. Difference transaction generator, previous state of the data, and so forth. And all that does is to make sure that the information that is being synced, is, the differences are, are generated, the instructions, what to do with those differences, and they're transmitted to the server. It's Delta sync to the server or to the cloud. It's how it's usually talked about. And that's transformative. That is very non-conventional. These patents have been, this patent has been through inter-parties re-exam and two IPRs. So it's novel. With that, I have no further. Thank you. We appreciate that. And Mr. Harber will restore a minute or two for rebuttal on the one-on-one issue only. Thank you, Chief Judge Prost. I don't have much to add on, on the issue than to what's in our brief and what I said before. I think the, the, if you look, for example, with the 757 patent and, and the 446 patent, all they claim are the abstract idea that you have one document. You change it. You compare the two documents and then you send the changes. There is no structure or specific information about how you generate those changes, only that you do so by comparing two versions of the data. There is no information and certainly nothing non-conventional about how the system is structured that is an improvement in any way. We don't deny, obviously, that when you send less than the full file, you're saving bandwidth. But as, as indicated earlier, there's nothing in this court's precedent that say that the, merely the benefits that flow from taking an abstract idea, sending the changes to something rather than the full thing, that that makes, that that raises even a question of whether something is patent eligible in, in capital, in the intellectual, intellectual ventures versus Capital One case. For example, it, the invention and the specification was a way of, comparing and reading together income, otherwise incompatible XML documents. But the fact that there was some benefit didn't render the claims eligible, patent eligible under Section 101. And in that case in particular, the court held that limiting the claims to a particular technological environment doesn't provide a non-abstract idea. And that's all that the four, four, six patent does under their reading is take what's in the seven, five, seven and limit it to media data, data or media files. There is, these claims are at a fundamental level, the most basic abstract idea that is we have been practicing for years, including when we send a pocket part to a treatise. And so they are therefore knowledgeable under Section 101. Thank you. And we thank both sides and the cases submitted. And that concludes our proceeding for this morning. Thank you all. Thank you. Your Honor. Thank you. Honorable court is adjourned from day to day.